## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS - FORT WORTH DIVISION

| | | |
|---|---|---|
| **JAMES SHEPHERD,** | § | |
| **Trustee for the James B. Shepherd Trust, and** | § | |
| **the JAMES B. SHEPHERD TRUST, and** | § | **CIVIL CAUSE NO.** |
| **NEW MILLENNIUM CONCEPTS, LTD.,** | § | **4:23-cv-826** |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ENVIRONMENTAL PROTECTION AGENCY,** | § | |
| **MICHAEL S. REGAN, Administrator, CHRISTINE** | § | **JURY TRIAL DEMANDED** |
| **TOKARZ, DAVID COBB, CAROL KEMKER, and** | § | |
| **KERIEMA NEWMAN, in their personal capacities** | § | |
| **Defendants.** | | |

## PLAINTIFFS' *FIRST AMENDED* COMPLAINT, and
## APPLICATION FOR PRELIMINARY INJUNCTION AGAINST THE
## ENVIRONMENTAL PROTECTION AGENCY

Plaintiffs the James B. Shepherd Trust ("Trust"), James Shepherd, and New Millennium Concepts, Ltd. come now to file their *First Amended Complaint* against the EPA for its violations of the Administrative Procedures Act and due process involving Berkey water filters.

To summarize, the public has relied on Berkey mechanical water filters without incident or regulation by the EPA for 25 years. In 2022, without notice, the EPA demanded Plaintiffs register their mechanical filter products as a "pesticide device" and then more recently as a "pesticide" without authority and without complying with the APA's rule-making process.

The EPA's failure to operate using plain language and follow APA guidelines has caused Plaintiffs devastating damage. Plaintiffs seek to enjoin the EPA from enforcing pesticide registration requirements against Plaintiffs' filter systems, and a declaration that the classification of Berkey filters as a pesticide is arbitrary, capricious, an abuse of discretion, and a clear error.

This amended complaint, filed under Rule 15(a), addresses standing questions, strengthens claims, and add facts to support the requested injunction following the EPA's opposing response.

# I.   TABLE OF CONTENTS

I.       TABLE OF CONTENTS .............................................................................. 2
II.      TABLE OF AUTHORITIES ........................................................................ 3
III.     PARTIES..................................................................................................... 5
IV.      VENUE AND JURISDICTION .................................................................. 6
V.       CONDITIONS PRECEDENT ..................................................................... 7
VI.      FACTS ........................................................................................................ 7
    A.   History of Water Filters.............................................................................. 8
    B.   Background – Berkey is a famous American brand known for its quality water filters
         created and sold by Plaintiffs, protected by patents and trademarks. ...... 9
    C.   Regulatory Background - Federal Insecticide, Fungicide, and Rodenticide Act ........... 11
    D.   After ignoring Berkey filters for decades, the EPA suddenly reversed its prior rules
         without notice or opportunity to accept stakeholder input, to Plaintiffs' detriment. ..... 13
    E.   The EPA changed course and began issuing SSUROs for pesticides. ........................... 15
VII.     AUTHORITIES ........................................................................................ 21
VIII.    PLAINTIFFS HAVE STANDING ............................................................ 23
IX.      CAUSES OF ACTION .............................................................................. 25
    A.   Count 1: Violation of the APA; 5 U.S.C. § 706 - Plaintiff seeks vacatur of the EPA's
         unnoticed new regulation for failure to follow the rule-making procedures.................. 26
    B.   Count 2: Plaintiff seeks vacatur of the EPA's reinterpretation of the "silver = pesticide"
         rule because it is Arbitrary, Capricious, and Not in Accordance with Law. ................ 29
    C.   Count 3: Plaintiff seeks vacatur for violation of the APA 5 U.S.C. § 706 and for violation
         of the U.S. Constitution U.S. Const. Amend. V as void for vagueness. ...................... 30
    D.   Count 4: Plaintiff seeks vacatur for violation of the APA 5 U.S.C. § 706 and violation of
         the U.S. Constitution Art. I, Separation of Powers and the Delegation Doctrine. ......... 31
    E.   Count 5: Plaintiffs seek declaratory judgment and damages for the EPA's violations... 34
    F.   Count 6: Procedural *Due Process* claim against the EPA for its violation of Plaintiffs'
         APA rights notice and comment rights and 5th Amendment Procedural Due Process. . 38
    G.   Count 7: Regulation of Gravity-Fed Mechanical Water Filters by Federal Agencies is
         Unconstitutional under the Ninth and Tenth Amendments............................................ 40
APPLICATION FOR PRELIMINARY, AND PERMANENT INJUNCTION ........................ 41
X.       PRAYER .................................................................................................... 55

## II.   TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ................................. 35

*Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir. 1983) ........................ 30

*American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) ................................................. 36

*Brackeen v. Haaland*, 994 F.3d 249, 420 (5th Cir. 2021) .......................................................... 34

*Brown v. Gardner*, 513 U.S. 115, 118 (1994) ........................................................................... 35

*Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) ............................................................... 35

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 142 (2012) ...................................... 10

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) .............................. 9, 37

*Contender Farms, L.L.P. v U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) ................. 35

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 63 (D.C. Cir. 2012)..... 29, 31

*CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009)................ 29

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022)................... 28

*Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) ................................................... 9

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).............. 26

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 254–55 (2012)............................. 32, 37

*Forrest Gen Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019) .................................................. 34

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020) ....... 35

*Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972)................................................................. 30

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021)............................................ 29

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) ................................ 29

*INS v. Chada*, 462 U.S. 919, 952 (1983) .................................................................................. 34

*Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) .................................................................... 34

*Larson v. Dom. & For. Com. Corp.*, 337 U.S. 682, 716 (1949)................................................. 8, 9

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).......................................... 29

*Loving v. United States*, 517 U.S. 748, 758 (1996) ................................................................... 34

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992.................................................................. 26

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1376 (Fed. Cir. 2017). ................... 31

*Mistretta v. U.S.*, 488 U.S. 361, 372–73 (1989) ....................................................................... 36

*Moore v. Hannon Food Serv. Inc.*, 317 F.3d 489, 497 (5th Cir. 2003) ...................................... 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).............. 30

*Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S. Ct. 661 (2022) ............................................. 43

*Panama Refining Co. v. Ryan*, 293 U.S. 388, 418–19 (1935) .................................................... 35

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)....................................................... 30, 32

*Pizza Hut, LLC v. Ronak Foods, LLC*, 5:21-CV-00089-RWS, 2022 WL 3544403, at *11 (E.D.
    Tex. June 17, 2022), aff'd sub nom. *Pizza Hut L.L.C. v. Pandya*, 22-40555, 2023 WL 5359079
    (5th Cir. Aug. 22, 2023)................................................................................................... 26

*Larson v. Dom. & For. Com. Corp.*, 337 U.S. 682, 716 (1949) .................................................. 8

*Ex parte Young,* 209 U.S. 123, 155–56 (1908) ............................................................... 8

*Shamloo v. Miss. St. Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516 (5th Cir. 1980) 33

S*hell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001) .................................... 30

*Smith v. Tarrant County College Dist.*, 670 F. Supp. 2d 534, 537 (N.D. Tex. 2009) ........... 44, 57

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 382 (5th Cir. 2021) 29

Te*x. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011) ................................... 35

*Torch Operating Co. v. Babbitt*, 172 F. Supp. 2d 113 (D.D.C. 2001) ............................... 9

*United States v. Davi*s, 139 S. Ct. 2319 (2019) .............................................................. 33

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ............... 28

*Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014) .................................................... 35

**Statutes**

28 U.S.C. § 1391(b) ........................................................................................................ 10

28 U.S.C. § 2201 ....................................................................................................... 9, 10

28 U.S.C. § 2202 ....................................................................................................... 9, 10

28 U.S.C. § 1331 ............................................................................................................ 8

28 U.S.C. § 1338(a) ........................................................................................................ 8

28 USC § 2412 ............................................................................................................. 10

40 C.F.R. § 152.25 ....................................................................................................... 26

5 U.S.C. § 553 .................................................................................................. 9, 24, 29, 30

5 U.S.C. § 702 ............................................................................................................. 26

5 U.S.C. § 704 ......................................................................................................... 37, 46

5 U.S.C. § 706(2) ..................................................................................................... 9, 29, 56

5 U.S.C. §§ 701–06 ..................................................................................................... 9, 10

5 U.S.C. § 556 ............................................................................................................. 37

5 U.S.C. § 557 ............................................................................................................. 37

7 U.S.C. § 135j(a) ......................................................................................................... 14

7 U.S.C. § 136 ......................................................................................... 9, 14, 17, 25, 26, 36

**Other Authorities**

Federal Rule of Civil Procedure 57 ................................................................................. 10

Fifth Amendment to the United States Constitution ..................................................... 24, 33

Nicholas Bagley, Remedial Restraint in Admin. Law, 117 COLUM. L. REV. 253, 275 (2017) 28

Part 162—Regulations for the Enforcement of the Federal Insecticide, Fungicide, and Rodenticide
    Act, 40 Fed. Reg. 28242, 28266 (July 3, 1975) ..................................................... 15

Pest Control Devices and Device Producers, Consolidation and Clarification of Requirements, 41
    Fed. Reg. 51065 (Nov. 19, 1976). ......................................................................... 15

Report submitted by Pat McCarran, Chairman, U.S. Senate Committee on the Judiciary,
    Administrative Procedure Act, Legislative History 1944–46, 79th Cong. (July 26,1946) .......... 30

Rep. No. 752, 796 Cong., 1st Sess. 15 (Nov. 19, 1945); H. Rep. No. 1980, 79th Cong., 1st Sess.
    25 (May 3,1946) ................................................................................................ 30

U.S. Constitution Art. I ................................................................................................. 34

U.S. EPA, Pesticide Devices: A Guide for Consumers, Pesticides, (last updated Dec. 29, 2022) 15

### III.    PARTIES

1.      Plaintiff James B. Shepherd Trust ("JBS Trust") is a Texas Trust holding equitable title to the majority partnership interest in New Millennium Concepts, Ltd. ("NMCL") and legal title to intellectual property licensed to NMCL, and issues licenses to other entities to manufacture and sell Berkey water filtration products. The JBS Trust receives royalties on the gross sales of Berkey filters sold by NMCL and Berkey International, LLC. Exh. A & D, E.

2.      Plaintiff James "Jim" Shepherd is the trustee of the James B. Shepherd Trust.

3.      Plaintiff New Millennium Concepts, Ltd. is a Texas-registered limited partnership. NMCL's primary place of business has been in Bedford, Texas, though it has relocating to Arlington, Texas (both are in the Northern District of Texas). Parties may serve NMCL through its attorney of record, the undersigned. NMCL contracts with other entities to sell Berkey-branded water filter systems based on intellectual property licensed to it by the JBS Trust. NMCL pays royalties based on gross sales for Berkey filter products. Exh. A.

4.      Defendant Michael S. Regan is the administrator of the Environmental Protection Agency ("EPA") and is sued in his official capacity. Regan may be served at the EPA headquarters at 1200 Pennsylvania Avenue, N.W. Washington, DC 20460 or wherever he may be found.

5.      Defendant Environmental Protection Agency is an agency of the United States Government which may be served at 1200 Pennsylvania Avenue, N.W. Washington, DC 20460.

6.      Defendants Christine Tokarz, David Cobb, Carol Kemker, and Keriema Newman are all EPA personnel to be enjoined in their official capacities for their individual ultra vires actions taken outside of their statutory authority and, in the alternative, for abusing their Constitutional authority as federal officers. They may be contacted through the EPA at the address above, or wherever they may be found. *See Larson v. Dom. & For. Com. Corp.*, 337 U.S. 682, 716 (1949); *Ex parte Young,* 209 U.S. 123, 155–56 (1908).

## IV.    VENUE AND JURISDICTION

7.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a), which provides jurisdiction based on federal questions.

8.    This Court has jurisdiction to review Defendants' unlawful actions and enter appropriate relief under the Administrative Procedures Act, 5 U.S.C. §§ 553, 701–06. An agency cannot significantly modify its regulations without notice by merely labeling the change as an interpretation when in reality the change is one in policy. *Torch Operating Co. v. Babbitt*, 172 F. Supp. 2d 113, 159 Oil & Gas Rep. 896, 2001 U.S. Dist. LEXIS 18417 (D.D.C. 2001).

9.    The Administrative Procedure Act ("APA") gives courts jurisdiction to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B). Indeed, the APA creates a "basic presumption of judicial review." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019).

10.    In challenges to agency action, courts ask only "whether the [agency's] decision was based on a consideration of the relevant factors" and "whether [the agency] has [made] a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

11.    This Court has jurisdiction to grant preliminary relief pursuant to the APA. 5 U.S.C. § 705 ("[T]he reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.").

12.    This Court has jurisdiction to grant declaratory relief, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. § 2202.

13.    This Court has jurisdiction to review Defendants' unlawful actions and enter relief under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), at 7 U.S.C. § 136n.

14.     This Court has jurisdiction to issue equitable relief to enjoin ultra vires agency action. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

15.     This case seeks declaratory relief and other appropriate relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, Federal Rule of Civil Procedure 57, and the Court's inherent equitable powers.

16.     Plaintiff seeks attorney fees under the Equal Access to Justice Act, 28 USC § 2412.

17.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in the district, a substantial part of property that is the subject of the action is situated in the district, and Plaintiffs have been damaged in this district.

18.     Plaintiffs here complain of unnoticed change of water filter regulation by the EPA and seek review in federal district court to obtain redress, as approved by the Supreme Court in *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 142 (2012) ("Agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires. Indeed, it would result in precisely the kind of 'unfair surprise' against which the Supreme Court's cases have long warned.")

## V.     CONDITIONS PRECEDENT

19.     The Plaintiff in the above-captioned matter hereby affirms that, as of the filing date of this Original Complaint, all conditions precedent required by the Federal Rules of Civil Procedure ("FRCP") have been duly satisfied to initiate legal proceedings in this jurisdiction.

## VI.     FACTS

## A. History of Water Filters.

20.     Humans have been using various techniques to filter water since antiquity. As recorded in the New Testament, the apostle Paul made what the EPA would call pesticidal claims about the addition of a little wine to water in his first letter to Timothy "for the sake of his stomach and frequent ailments."[1]

21.     The Sushruta Samhita (3rd century CE, or earlier) detailed various methods to purify water, including boiling and filtering water through sand, coarse gravel, and charcoal filters (Baker & Taras, 1981). These writings suggest that these ancient people sought better tasting water, with the assumption that better tasting water was also cleaner water. Those filtering techniques paved the way for later understandings about water sanitation.

22.     The Greek scientist Hippocrates invented the first early water filter, known as the 'Hippocratic sleeve', which used a cloth bag to filter out the impurities from the Greek aqueducts. The water was boiled and poured through the cloth, which trapped the sediments that were causing the bad taste and smell, creating cleaner, better tasting drinking water.

23.     Luc Antonio Porzio published the first known illustrated description of sand filters in 1685, which proposed multiple-filtration through sand, preceded by straining and sedimentation, a device that used gravity-fed mechanical filtering.[2]

24.     In 1746, Joseph Amy of France received the first patent for a water filter, placed on the market in 1750, using wool, sponge, and charcoal to perform mechanical filtering.

25.     In 1804 the first actual municipal water treatment plant designed by Robert Thom, was built in Scotland, where water was treated by a sand filtration process; potable water was available to every household in Scotland within a few years.

---

[1] See 1 Tim. 5:23, "No longer drink only water, but use a little wine for the sake of your stomach and your frequent ailments." ESV.
[2] Mays, Larry, A brief history of water filtration/sedimentation, Water Science & Tech: Water Supply, V.13.3, 2013.

26.     In 1827, John Doulton invented the ceramic water filter to remove bacteria from drinking water, and then the Doulton Manganous Carbon Filter in 1862, which tied in with the French chemist, Louis Pasteur's research into bacteria, and was one of the first carbon cartridge type filters. By 1835, Henry Doulton's cartridges could remove bacteria with 99% efficiency using porous ceramic bowls and diatomaceous earth to filter water, resulting in a commission from Queen Victoria for Doulton to provide a filter for her royal household.

27.     The difference between those filters and Berkey filters is qualitatively no different, except that Berkey filters use a far more efficient and robust construction, and no manufacturer or resident of the early United States had to receive permission to use these devices from the federal or state government. Certainly, those early citizens would claim the right to filter their own water using mechanical filter processes.

**B.  Background – Berkey is a famous American brand known for its quality water filters created and sold by Plaintiffs, protected by patents and trademarks.**

28.     More than two decades ago, the JBS Trust licensed New Millennium Concepts, Ltd to commercialize its gravity-fed filter elements and began marketing mechanical filter systems developed by Plaintiff Jim Shepherd, owned by the JBS Trust, who received U.S. Patent 7,232,517 B1 in 2007 and sold under various Berkey-related trademarks, including USPTO Registration No. 3721529 for "BERKEY", and others. Exh. A & D.

29.     Berkey International, LLC ("Berkey Int'l") is a Puerto Rico based manufacturer of Berkey filtration systems, which holds a license from the JBS Trust to manufacture Berkey filtration systems which include Berkey filter elements, the subject of the EPA's concerns. Exh. A & D.

30.     New Millennium Concepts, Ltd ("NMCL") has an exclusive license from the JBS Trust to market Berkey Water Filtration products. NMCL has its principal place of business in Arlington, TX.  NMCL also is a distributor for Berkey Int'l. A & D. This complaint may jointly refer to the JBS Trust, NMCL, and Berkey Int'l corporately as "Berkey."

31.     Due to the written license agreement between the JBS Trust and Berkey Int'l, Berkey Int'l pays a percentage of gross sales as royalties to the JBS Trust for use of the intellectual property developed by Jim Shepherd and held by the Trust. Exh. A, D & E.

32.     Additionally, Berkey Int'l and NMCL are required to pay a percentage of gross sales as of products protected by the Trust's intellectual property to the Trust, per the individual licensing agreement between the Trust and Berkey, and the Trust and NMCL. Exh. A, D, & E. As explained below, those payments have been severely diminished due to the SSUROs. Exh. A, D, E.

33.     NMCL's signature product is its Black Berkey Filter. Black Berkey filters employ proprietary, trade-secret technology in gravity-fed filters which employ microscopic pores to mechanically trap and eliminate contaminants from water. Berkey distributes its filters to authorized retailers. Exh. A.  The mechanical water filters covered by the intellectual property and licensing agreements use a registered pesticide as a treated article. The registered pesticide only protects the mechanical filter and has no pesticidal purpose. Exh. E. *See Sealed Declaration of Jim Shepherd.*

34.      NMCL is a longstanding American company that has been marketing proprietary Berkey water filters and other water-related products since 1998.

35.     During NMCL's 25-year existence, the EPA never sought to enforce FIFRA regulations against Berkey products as pesticides until 2022. Exh. A. As explained below, Congress created FIFRA to regulate agricultural products. Exh. C-1. EPA guidelines state that mechanical filter construction warrants regulation only as a device, and not a pesticide. Exh. C-2 & C-6.

36.     Unfortunately, unauthorized retailers and knock-offs of Berkey's products abound; all attempting to benefit from Berkey's reputation for excellent, reliable products. Berkey struggles with knock-off filters because a knock-off competitor can build filter systems using mundane carbon filters constructed to fit into the Berkey filter system as a form-and-fit physical

replacement, but not a "function" replacement, being made with different materials and unable to perform as Berkey filters do. The knock-off filters are designed to imitate the appearance of Black Berkey filters but utilize cheap and ineffective materials compared to the components of authentic Berkey filters. In this way, purveyors of knock-off and imitation Berkey filters can market them at a fraction of the cost of genuine Berkey filters. Consumers cannot easily distinguish between genuine Berkey filters and inferior knock-off filters. Exh. A & D.

37.    To Plaintiffs' knowledge, the EPA has not engaged in enforcement actions against any unauthorized sellers of Berkey knock-offs making or implying false function claims, but is singling out genuine Berkey products, a longstanding American brand known for quality and performance.

38.    The EPA is applying its regulations and enforcement actions unevenly, focusing on Berkey while neglecting unauthorized knock-off and counterfeit manufacturers. The EPA's actions are destructive to Berkey and reward low-value knock-offs and counterfeit filters, as these low-quality filters do not perform as well and such products are typically made overseas by manufacturers who are very difficult to identify and thus can operate without fear of being sued in the United States.

39.    The end result of the EPA's recent actions is to make the market less safe for American consumers. Exh. A & D.

**C. Regulatory Background - Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)**

40.    The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA, 7 U.S.C. ch. 6 § 136) was passed in 1947, amended in 1972 by the Federal Environmental Pesticide Control Act (FEPCA) and again by the FIFRA Amendments of 1988. FIFRA requires that all pesticides be licensed by the Environmental Protection Agency before they may be sold or distributed in commerce. 7 U.S.C. § 135j(a). By contrast, manufacturers of pesticidal devices need only register the manufacturing facility, not the devices themselves. § 135e. Exh. C-1.

41.     According to the EPA, since 1975, the EPA has interpreted "devices" to include "water filters . . . (*except those containing substances or mixtures of substances which are pesticides*)." Part 162—Regulations for the Enforcement of the Federal Insecticide, Fungicide, and Rodenticide Act, 40 Fed. Reg. 28242, 28266 (July 3, 1975) (emphasis added).

42.     As the EPA explained in a 1976 guidance document, if an "article incorporates a substance or mixture of substances *intended to prevent, destroy, repeal, or mitigate any pest*, it is considered to be a pesticide." Pest Control Devices and Device Producers, Consolidation and Clarification of Requirements, 41 Fed. Reg. 51065 (Nov. 19, 1976) (emphasis added).

43.     Under the heading "Products Commonly Mistaken as Devices," EPA notes that:

> Where a product that would otherwise be a device also incorporates a pesticidal substance, it may be considered a pesticide product. For example, a filter that physically traps microbial pests (generally a device) would be an antimicrobial pesticide product if it also incorporated a pesticidal substance *that kills those pests to improve the efficacy of the entire system*. (emphasis added)

U.S. EPA, Pesticide Devices: A Guide for Consumers, Pesticides, (last updated Dec. 29, 2022).[3]

The same website also explains that if a water filter "contains any substance *intended to disinfect the water*, then the unit is generally considered a pesticide that must be registered in order to be sold and distributed." (emphasis added) *See Defendant's Memorandum*, *id.*

44.     In 2000, the EPA adopted a "Treated Articles Exemption to Antimicrobial Pesticides" policy, announced by a Pesticide Registration Notice 2000-1, dated March 6, 2000. This policy exempts EPA registration articles that are treated with already registered pesticides, the purpose of which is solely to protect the articles themselves (and not to support health claims). Exh. B-20.

45.     Berkey filters were considered treated articles until 2022, as they are treated by a registered pesticidal product designed to protect the filter itself, but contains no product that acts as a pesticide to the effluent water traveling through the filter. Exh. A, D & E.

---

[3] https://www.epa.gov/pesticides/pesticide-devices-guide-consumers (last visited August 22, 2023)

**D.  After ignoring Berkey filters for decades, the EPA suddenly reversed its prior rules without notice or opportunity to accept stakeholder input, to Plaintiffs' detriment.**

46.     Around April 28, 2022, the Environmental Protection Agency stopped an inbound NMCL container at customs to conduct an EPA inspection. To address the matter, NMCL's shipper, Charles Shayer, set up a call on for May 3, 2022, with Christine Tokarz, a Region 8 EPA inspector.

47.     On May 1, 2022, EPA agent Tokarz confirmed the upcoming call by email, writing, "This is a virtual compliance call to discuss devices and compliance with FIFRA regulations." She also included links to EPA Guidance for pesticide devices. Exh. B-1.

48.     On or about May 3, 2022, Tokarz stated during the phone call that Berkey products may be in violation of 7 U.S.C. § 136j(a)(1)(F) for distributing a device that is misbranded for allegedly "potentially false or misleading pesticidal claims." Referring to her review of NMCL's website and packaging, she further stated, "I can assure you, though, these are pesticide device claims, I have no doubt about that in my mind". She concluded the call saying "My goal here is to help American companies stay in business and get them into compliance, not to enforce a bunch of, you know, record keeping rules. That's not really my goal". Exh. B.

49.     On or about May 4, 2022, Shepherd learned that the EPA had begun requiring EPA establishment numbers for water filter manufacturers, including Berkey manufacturing facilities, and since the COVID-19 era, the EPA was considering reinterpreting its regulations on exempt devices, removing the device exemption for any water filters that claimed to remove viruses, while giving no guidance to stakeholders in affected companies or taking their input. Exh. A.

50.     Around this same time, Shepherd learned from businesses contacts that the EPA may be targeting water filter manufacturers making virus removal claims and perhaps pathogenic bacteria removal claims, and reinterpreting their regulations, though neither he nor any of his manufacturers were aware of any formal change to the relevant laws or regulations. Further, those same

enforcement actions indicated to Shepherd that the EPA may now consider outdoor water filters that can filter raw untreated water and remove waterborne pathogens to be pesticides, Exh. A.

51.     About May 5, 2022, Tokarz issued an EPA Close Out letter which stated, "Under FIFRA section 7, all pesticide devices sold or distributed in the United States must be produced in a registered establishment. 7 U.S.C. §§ 136e(a), 136j(a)(2)(L). A pesticide device is defined as any instrument or contrivance that is intended for trapping, destroying, repelling, or mitigating any pest or any other form of plant or animal life" under the EPA "Reinterpretation" of the rule. Exh. B-2 (Tokarz Close Out Letter), Exh. C-1.[4] At no point has Tokarz explained why the EPA, which has been aware of Berkey products for 25 years, never required any sort of registration until 2022.

52.     In May of 2022, in an effort to mollify Tokarz and the EPA, NMCL requested an EPA establishment number for Texado, Ltd., its third-party distribution center. The EPA issued Establishment No. 101921-CO-1 shortly thereafter and communicated that development to Tokarz in support of NMCL's position that it was compliant with the new demand for Berkey filters to be treated as a pesticide device, as the establishment number was now being posted on the outside of the box for each Berkey filtration system that they manufactured. Tokarz denied that these actions satisfied FIFRA. About June 8, 2022, NMCL filed a 30-day report making NMCL compliant with the EPA's requests pertaining to Pesticide Devices. Exhibit A, B-3 (Email Thread discussing NMCL 30-day Report, Texado Establishment Number).

53.     After the EPA's demands for pesticide device compliance, NMCL verified that all its claims were accurate according to the test data for removing waterborne pathogens. Exh. A.

---

[4] The laws cited by Tokarz do not show that a pesticide device must be produced in a registered establishment. §136e(a) requires registration of establishments that produce *pesticides*, but nowhere requires registration of establishments producing devices; § 136j(a)(2)(L) requires producers to refrain from violating § 136e.

**E. The EPA changed course and began issuing SSUROs for pesticides.**

54.     James Enterprises sells Berkey products while doing business as Berkey Filters. During an EPA inspection of its facilities on November 22, 2022, the staff of James Enterprises noted that the EPA took note of language on products that suggested pesticide claims. EPA inspector Tokarz mentioned to the James Enterprises staff, "that NMCL mentions that their filters remove viruses and that the EPA is cracking down on virus claims because of COVID-19," and "that the EPA had stepped up its enforcement efforts, particularly in regard to anti-microbial devices." Because of the inspection, NMCL again checked all its virus removal claims and testing to verify that no misleading or fraudulent contaminant-removal claims were being made and found that all claims could be verified by third-party lab tests. Exh. A.

55.     On or about December 2, 2022, Tokarz wrote to James Enterprises, "EPA believes that the products listed below may be subject to FIFRA regulations: *Black Berkey Filters, Sport Berkey Replacement Filters, Travel Berkey Water Filters, Big Berkey Water Filters, Royal Berkey* Water *Filters, Imperial Berkey Water Filters, Crown Berkey Water Filters, the Berkey Light Water Filters, and the Sport Berkey Water Bottle.* Please provide the requested documentation on each of the 9 separate products identified above." Exhibit B-5 (Tokarz Email, December 2, 2022).

56.     On or about December 27, 2022, EPA agent David Cobb signed an EPA Stop Sale, Use or Removal Order (SSURO) to James Enterprises, in Docket Number: FIFRA-08-2023-0011. This SSURO requires James Enterprises to respond within 30 days and then monthly afterward to Christine Tokarz. Exh. B-4. This was the first SSURO alleging that Berkey water filter systems were unregistered, misbranded pesticides. Exh. A.

57.     This was an unfair surprise in which EPA did not provide any sort of explanation, notice, or guidance before issuing the order. Exh. A. The SSURO states that it is based in part on a statement found on a foreign European website claiming that Black Berkey elements utilized silver

*to protect the filter*, as well as filter labeling that stated, "Black Berkey Purification Elements: VIRUSES: >99.999% PATHOGENIC BACTERIA (AND SURROGATES) >99.9999% -Exceeds Purification Standard (Log 6): Bacillius atrophaeus (Anthrax Surrogate)." Exh. B-4.

58.    To Plaintiffs' knowledge, at no point has any Berkey-authorized entity claimed that the silver in their products is intended to be used for any purpose other than to protect the filter itself. Berky has never claimed pesticidal applications for silver in their products. Exh. A & D. The EPA's SSUROs rely on a statement made by a foreign retailer of Berkey products which made claims that Berkey has never endorsed, yet is now being held to account for. The EPA has not shown that Plaintiffs or SSURO recipients have had ownership, control, or custody over any products using or claiming to use silver as a pesticide, or any products from the foreign retailers.

59.    Though the SSURO to James Enterprises recognizes that the mention of silver is in the context of protecting the filter at para. 26, para. 27 concludes "These claims indicate that **Berkey Black[5] Filter Products** are substances or mixtures of substances intended for preventing, destroying, repelling, or mitigating any pest, and thus, pesticides pursuant to section 2(h) of FIFRA, 7 U.S.C. § 136(u)." This conclusory statement by the EPA does not identify the "substance or mixture of substances" in Berkey's filter constitute pesticides. The drafter of the SSURO latched onto the mere presence of silver and shoehorned it into the definition of pesticide, ignoring its stated purpose, even though the SSURO repeats the language of the European website: "Yes, silver is used as an antimicrobial to self-sterilize the Black Berkey® elements. Testing was conducted both internally and by Analytical Services, Inc. to ensure that the silver used does not leach into the purified water."  Exh. B-4, para. 26. Neither Plaintiffs nor the SSURO recipients have ever had ownership, custody, or control over the European website when it wrongly made the above claim.

---

[5] The term "Berkey Black" is a name used by knock-off filter marketers to sell fake Black Berkey filters. Troublingly, "Berkey Black" was used a dozen times in the SSURO.

Further, Plaintiffs believe the name "Berkey Black" shows that it is a knock off product, the real name of the products are "Black Berkey" filters. *See* Exh. A & B6-11, & D.

60.    Prior to the SSURO to James Enterprises, all NMCL and Berkey's discussions and correspondence with the EPA were based upon a long-time joint understanding that Black Berkey elements were treated articles or "pesticide devices" and never "pesticides," making them exempt from registration. Exh. A.[6]

61.    In mid-January of 2023, NMCL and James Enterprises agreed that, rather than arguing with the EPA whether Black Berkey products were a pesticide or pesticide device, Berkey products would change their status to that of a treated article and remove all testing references and statements that could be construed to indicate that the filters could remove waterborne pathogens. Exh. A. James Enterprises and NMCL thereafter changed their websites to remove all waterborne pathogen removal claims. Exh. A.

62.    Undeterred by any communication with NMCL or affiliated businesses, Tokarz has continued to target Berkey sellers and issued multiple SSUROs, all of them based on allegations that Berkey products are unregistered, misbranded pesticides.

63.    On or about February 3, 2023, Keriema Newman digitally signed for Carol L. Kemker when issuing an SSURO, Docket Number: FIFRA-04-2023-0700, to Vendor B, an OEM manufacturer for NMCL. Exh. B-6 ("Vendor B SSURO"). The Vendor B SSURO alleged that Vendor B violated FIFRA by selling the Black Berkey Filter Products, which the EPA considered to be unregistered, misbranded pesticides**.** Vendor B also agreed to adopt the "treated article" approach and remove all references to testing and statements that could be construed to indicate that the filters removed waterborne pathogens. Exh. A, B-6.

---

[6] Treated articles are not registered or identified; pesticidal devices must be made in a EPA-registered establishment; pesticides must be individually registered. Exh. A.

64.     On March 3, 2023, David Cobb issued an SSURO, Docket Number: FIFRA-08-2023-0015, to Fritz Wellness, a Berkey dealer, requiring a monthly response to Tokarz. It alleged Fritz Wellness violated FIFRA by selling the Black Berkey Filter Products, which the EPA considered to be unregistered, misbranded pesticides. Exh. B-7. Again, the knock-off filter name "Berkey Black" was used in the SSURO. Exh. A, B-7.

65.     On March 6, 2023, David Cobb issued an SSURO, Docket Number: FIFRA-08-2023-0014, to Eden Valley Farms LLC, a Berkey dealer. Exh. B-8 ("Eden Valley Farms SSURO") requiring a monthly report to Tokarz. The SSURO followed the now-established pattern and alleged that Eden Valley Farms LLC violated FIFRA by selling Black Berkey Filter Products, which the EPA considered to be unregistered, misbranded pesticides. Exh. A, B-8.

66.     On March 7, 2023, David Cobb issued an SSURO, FIFRA-08-2023-0017, on Mountain Mama Natural Foods, Inc., a Berkey dealer, again alleging that Black Berkey filters are unregistered, misbranded pesticides and required a monthly report to Sherrie Kinard. Exh. B-9. Again, the knock-off filter name "Berkey Black" was used in the SSURO.

67.     On May 2, 2023, David Cobb issued an SSURO, Docket Number: FIFRA-08-2023-0037, to Good Earth Natural Foods Co. South Dakota ("Good Earth"), a Berkey dealer, alleging that Good Earth violated FIFRA by selling the Black Berkey Filter Products, which the EPA considered to be unregistered misbranded pesticides. Exh. B-10.  Again, the knock off filter name "Berkey Black" was used in the SSURO a dozen times and the Good Earth SSURO required it to respond to Tokarz with a monthly report.

68.     On May 8, 2023, David Cobb issued an SSURO, Docket No. FIFRA-08-2023-0038, to Berkey International, LLC (a.k.a. Vendor A), which alleged that Berkey Int'l violated FIFRA by selling Black Berkey Filter Products, which the EPA considered to be unregistered, misbranded pesticides. Exh. A, B-11, & D. Berkey Int'l is in region 2, and not region 8; Berkey Intl. has never

been contacted by EPA region 2. Again, the SSURO uses the knock-off filter name "Berkey Black", and required Berkey Int'l to send monthly reports to Tokarz. Exh. B-11.

69.     Starting in late January of 2023, NMCL began sending James Enterprises ("JE") new packaging designs, which were consistent with Berkey products being treated articles, for submission to the EPA for approval. Exh. A. Thereafter, JE submitted multiple iterations of these designs to the EPA. Each was rejected for minor changes that could have been communicated to JE during the EPA phone discussion in May of 2022, the EPA inspection in November 22, 2022, or any number of email communications. Exh. A, B-13 ("Rejected Packaging Proposals").

70.     During discussions with the EPA on packaging, Tokarz told JE that the image of a lake, which has been on the packaging for two decades, must be removed because it conveys an idea that the filter can be used to remove pests from lake water. Exh. A, B-13.

71.     In June of 2020, in response to new products offered to the public regarding COVID-19, the EPA had ordered Amazon and eBay to stop the sale of certain pesticide products that were identified on a list attached to the order. Exh. B-12 ("EPA Order to Amazon and eBay"). Berkey products were not included in the original list of offending products in 2020, nor were they listed in a 2021 update. Exh. B-12. However, in an apparent reaction to the SSUROs issued in the first half of 2023, Amazon restricted sales of Berkey products on June 24, 2023 without identifying the reasons they believed Berkey products violated FIFRA. Exh. A, B-12.[7]

72.     At all times during these events, EPA agent Tokarz has been an inspector in Region 8.

---

[7] In a news story about the EPA Order, EPA Administrator Andrew Wheeler was quoted as saying, "These stop sale orders to Amazon and eBay demonstrate the Trump Administration's continued commitment to protecting the health and safety of Americans…We remain vigilant against the claims of producers that falsely assert their efficacy and safety. Of particular concern are products that falsely claim to be effective against COVID-19. It is our duty to continue transparent communication with the public on unregistered products that may cause injury to consumers, and immediately remove them from commerce." https://allongeorgia.com/georgia-public-safety/epa-orders-amazon-and-ebay-to-stop-sale-of-certain-pesticide-products/ (last assessed July 27, 2023).

73.     NMCL has been in business for more than twenty-five years and has always rigorously complied with EPA environmental regulations. NMCL has periodically hired EPA consultants to review its websites and claims and to ensure that NMCL complied with EPA regulations. Exh. A.

74.     Since May of 2022, NMCL has complied with the exempt treated device regulations the EPA suddenly decided to require, by obtaining and then attaching establishment numbers to its products. NMCL has completed its reporting requirements and verified its advertising claims for accuracy. NMCL has been and remains in compliance with treated article regulations. Exh. A.

75.     During early 2023, NMCL and JE modified their websites to change the status of Berkey water filter products to treated articles. NMCL repackaged the Black Berkey Filters with packaging that did not make any waterborne pathogen removal claims for U.S. sales, and all the un-repackaged filters were marked for international export. Exh. A.

76.     On or about July 12, 2023, NMCL agents conferenced with EPA Inspector Tokarz. Tokarz stated that NMCL continues to make pesticide claims about Berkey products. NMCL has slowly come to realize, based on the many rejections of proposed designs in the Rejected Packaging Proposals, the phone conversations rejecting even an image of a lake that Berkey has used for many years, Tokarz and her allies at the EPA will never allow Berkey to sell its filters without registration, even if Berkey just sold a boxed filter and provided no specification to consumers, because consumers know that Berkey is a water filter that has a reputation for reducing contaminants in water, and Berkey will never escape that reputation.

77.     Berkey Int'l has $38,500,000 in wholesale inventory that it is unable to manufacture and sell. Storage costs are approximately $63,000 per month. More than 500 jobs have been lost and more are imperiled by the irrational decision to creatively re-interpret a rule so that the mere presence of silver is enough to warrant registration as a pesticide, though the EPA is aware that the referenced silver is used to protect the filters, and has no pesticidal function. And even when

the EPA is informed that a registered pesticide is the source of the silver, and the purpose of the pesticide is to protect the filter, and the EPA registration for the pesticide specifically states that the pesticide is used for that purpose, the EPA still wants to force registration as a pesticide.

78.     NMCL cannot be colorably accused of endangering any life, but has made water cleaner for millions of people for decades. This vendetta on the part of Tokarz and the EPA endangers all of that, while also encouraging low-grade knock-offs and counterfeit filters to fill the market gap with cut-rate products. If a member of the public is damaged by such filters, redress is more difficult than if they were damaged by a Black Berkey filter, as the sourcing for knock-off filters is rarely obvious, the filters are often deceptively presented as exact replacements for Berkey filters, in spite of their differing low-quality construction, and they are almost always produced outside the US, where seeking redress for damage is almost impossible. Exh. A & D.

## VII.     AUTHORITIES

### A.  General

79.     The Fifth Amendment to the United States Constitution states:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### B.  Administrative Procedures Act (5 U.S.C. 553)

80.     The holy codex of the administrative state is the Administrative Procedure Act ("APA"), which outlines the general procedures an agency must follow to execute final agency action. Unless the agency's enabling statute requires formal rulemaking, the APA provides that an agency must conduct notice and comment rulemaking to promulgate rules. 5 U.S.C. § 553.

81.     To change the rights and duties of interested parties, an agency must promulgate rules by notice and comment rulemaking. 5 U.S.C. § 553. However, Section 553 provides for exceptions to notice and comment rulemaking, for example, interpretive rules. *Id.* The condition on using this exception for notice and comment rule making is that it cannot change the rights and duties of interested parties that would be subject to the rule and it cannot use mandatory language.

## C. FIFRA (7 U.S.C. chap. 6 § 135–136y)

82.     The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) was passed by Congress in the early 20th Century to regulate agricultural pesticides. Products of interest to the EPA under FIFRA can be loosely categorized as pesticides, pesticidal devices, and treated articles.

83.     FIFRA defines "pesticide" as:

> (u) Pesticide. The term "pesticide" means (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer, except that the term "pesticide" shall not include any article that is a "new animal drug" within the meaning of section 201(w) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(w)), that has been determined by the Secretary of Health and Human Services not to be a new animal drug by a regulation establishing conditions of use for the article, or that is an animal feed within the meaning of section 201(x) of such Act (21 U.S.C. 321(x)) bearing or containing a new animal drug. The term "pesticide" does not include liquid chemical sterilant products (including any sterilant or subordinate disinfectant claims on such products) for use on a critical or semi-critical device, as defined in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

7 U.S.C. § 136u.

84.     FIFRA defines "pesticide device" as:

> as "... any instrument or contrivance ... which is intended for trapping, destroying, repelling, or mitigating any pest or any other form of plant or animal life[,]" and "pesticide" in § 136(u) as "... (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer[.]"

7   U.S.C. § 136h. FIFRA requires pesticide manufacturers register their pesticides with the EPA.

85. The EPA recognizes "Treated articles or substances" as follows:

An article or substance treated with, or containing, a pesticide to protect the article or substance itself (for example, paint treated with a pesticide to protect the paint coating, or wood products treated to protect the wood against insect or fungus infestation), if the pesticide is registered for such use.

40 C.F.R. § 152.25.

86. For a broad judicial discussion of these categories, see generally, *Anderson v. McCarthy*, No. C 16-00068 WHA, 2016 U.S. Dist. LEXIS 63671 (N.D. Cal. 2016) (denying a motion to dismiss and describing pesticide-coated seeds as "pesticidal devices" as opposed to "pesticides").

## VIII.    PLAINTIFFS HAVE STANDING

87. Plaintiffs have standing under the right of review provided in the APA at 5 U.S.C. § 702, 7 U.S.C. Ch. 6 §136n(b), and "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).

88. To establish [Article III] standing, a plaintiff must show that he or she suffered an injury that is (1) "concrete, particularized, and actual or imminent"; (2) "fairly trace[able] to the challenged action, and not . . . th[e] result [of] the independent action of some third party not before the court"; and (3) "it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

89. A party which is owed royalties has standing to sue based on diminished payments due to an agency action. *Pizza Hut, LLC v. Ronak Foods, LLC*, 5:21-CV-00089-RWS, 2022 WL 3544403, at *11 (E.D. Tex. June 17, 2022), aff'd sub nom. *Pizza Hut L.L.C. v. Pandya*, 22-40555, 2023 WL 5359079 (5th Cir. Aug. 22, 2023). (*See also Plaintiffs Reply to Defendant's Memorandum.*)

90.     Because Berkey Int'l is obligated to pay NMCL a royalty on sales it makes and because NMCL's sales are diminished by the EPA's actions, NMCL has standing. Exh. E. *Id.* [8]

91.     Because JBS Trust has a right to royalty payments from NMCL, and NMCL is not receiving income that it would receive but for the EPA's improper, unnoticed irrational actions, JBS Trust has standing, just like Pizza Hut did. *See id.*

92.     To round out standing, Plaintiffs have Article III standing based on the following elements:

1) Due to the EPA, the gross sales of Berkey Int'l has dropped to zero because the EPA's SSURO disallows any Berkey filter sales. Because the royalties on zero sales is zero, Berkey Int'l has ceased making payments to NMCL. Similarly, the JBS Trust has stopped getting payments due to the stopped sales.  Every day the SSUROs are active takes sales away that would normally contribute to the payments from NMCL and Berkey International, LLC to the JBS Trust in the regular course of business.[9] Exh. A, D,  E.

2) SSUROs require the recipients to *stop* selling certain specified products. The EPA has shut down Berkey International, LLC and many others that have similar agreements with JBS Trust, or have agreements with NMCL or Berkey International, LLC. At the very least, SSUROs have stopped Berkey International, LLC's sales significantly harming the royalty payments on

---

[8] "Franchisee will pay [Pizza Hut] monthly an amount equal to 6.0% of Franchisee's Gross Sales from each System Restaurant for the prior month. . . . If [Pizza Hut] may apply any payments received from Franchisee to the oldest amounts due from Franchisee, regardless of any contrary designation by Franchisee. Id. This provision entailed an effective royalty of 6-percent per month of total gross sales, non-inclusive of any late fees owed." *See* Trial Tr. (Day 1) at 71:15–72:11. *Pizza Hut, LLC v. Ronak Foods, LLC*, 5:21-CV-00089-RWS, 2022 WL 3544403, at *11 (E.D. Tex. June 17, 2022), aff'd sub nom. *Pizza Hut L.L.C. v. Pandya*, 22-40555, 2023 WL 5359079 (5th Cir. Aug. 22, 2023); "Franchisee Defendants allege that IPHFHA is not a party to this suit and therefore Pizza Hut has no damages or standing as to the Advertising Fees. Docket No. 344 ¶ 9. However, the Court determines otherwise, based on the aforementioned crediting operation in the Franchise Agreement. If a Franchisee Defendant fails to pay any of the fees it owes to IPHFHA, then that Franchisee Defendant would not get a credit to offset its payment obligations to Pizza Hut—and then Pizza Hut would be owed the amount due. See PX15 § 7.1(A)–(B)." *Id* at *12.
[9] The complete stop of sales is completely responsible for the lost income, and no other reason can begin to explain the loss. Defendant may point to a lawsuit in a flailing attempt to argue otherwise, but demand for the product is not the issue. Exh. A.

gross sales. Further, the same goes for the royalty payment for sales protected by the IP from Berkey International, LLC and NMCL. Exh. A & D. *See id.*

3) This court can redress the injury with a favorable decision by declaring the EPA's SSUROs as arbitrary, capricious, an abuse of discretion, and in clear error of judgment. This court can redress the injury by issuing an injunction against the EPA or EPA agents named in this case from enforcing the SSUROs against Berkey Products. This court can redress the injury by declaring Berkey Products to be a pesticide device or a treated article, or not under the regulation of FIFRA entirely. This Court could redress Plaintiffs monetary damages through the individual agents of the EPA for their ultra vires actions, specifically the loss of payments on gross sales and royalty payments. Exh. A & D.

## IX.    CAUSES OF ACTION

93.    Through this suit, Plaintiffs bring against Defendants three counts for breaching the restrictions that the Constitution and Congress have placed upon the Defendants.

94.    For Plaintiff, vacatur of the SSUROs and new rules that "any silver in a filter makes for a pesticide, irrespective of intent" would remedy the harms that flow therefrom. Indeed, in this Circuit, for APA violations that are unlawful, the default—and appropriate—remedy is vacatur. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022) ("'The ordinary practice is to vacate unlawful agency action.") (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). For example, "nearly every logical outgrowth violation leads to vacatur." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 COLUM. L. REV. 253, 275 (2017).

95.    Alternatively, if the EPA's reinterpretation of FIFRA were to stand, declaratory and injunctive relief declaring the reinterpretation of the mechanical filter as a pesticide under the

FIFRA unconstitutional and enjoining the Agencies from enforcing the same would remedy the harms that flow from the EPA's enforcement action predicated on its reinterpretation.

96.     In the claims below, Plaintiffs first assert more traditional claims that: a) the EPA failed to follow its rule-making procedures; b) irrespective of the procedures, the EPA's new rules are contrary to RIFRA. Plaintiffs also make constitutional claims, including void-for-vagueness and due process claims under the 5th Amendment, a separation-of-powers and delegation doctrine challenge, and a limited government challenge under the Ninth and Tenth Amendments.

**A. Count 1: Violation of the APA; 5 U.S.C. § 706 - Plaintiff seeks vacatur of the EPA's unnoticed new regulation for failure to follow the rule-making procedures.**

97.     As the reviewing court in this case, under 5 U.S.C. § 706(2)(D), "[t]he reviewing court shall . . . hold unlawful and set aside any action, findings, and conclusions found to be . . . without observance of procedure required by law[.]"

98.     The APA's rulemaking requirements include a mandate for federal agencies to provide the public with a meaningful opportunity to comment on the elements of a rule and the materials that form its basis. *See*, *e.g.*, 5 U.S.C. § 553(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995)("The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process.").

99.     The Administrative Procedure Act ("APA") provides that, whenever an agency undertakes to promulgate, amend, or repeal a regulation, it must first issue a "notice of proposed rule-making . . . in the Federal Register"—which must include, among other information, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). A corollary of this requirement is that "the final rule the agency adopts must be a logical outgrowth of the rule proposed. The object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up).

100.    Even if a "final rule d[oes] not amount to a complete turnaround from the [proposed rule]," the notice of proposed rulemaking is inadequate if it does not "indicate[] that the [agency] was contemplating a particular change" that appears in the final rule. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009); *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 382 (5th Cir. 2021).

101.    An agency's "notice must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up).

102.    The APA requires federal agencies, including Defendants, to (a) give general notice of proposed rulemaking in the Federal Register and thereafter (b)"give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments. " 5 U.S.C. § 553(c).

103.    An agency action is not reasonable if the agency "entirely failed to consider an important aspect of the problem[.]" *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

104.    "An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

105.    "An agency need not respond to every comment, but it must respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments." *Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir.), supplemented, 713 F.2d 795 (D.C. Cir. 1983) (internal quotations omitted).

106.    The House and Senate reports with regard to this provision state that "the agency must analyze and consider all relevant matter presented." S. Rep. No. 752, 796 Cong., 1st Sess. 15 (Nov. 19, 1945); H. Rep. No. 1980, 79th Cong., 1st Sess. 25 (May 3,1946) "[Public] participation . . . in

the rule-making process is essential in order to permit administrative agencies to inform themselves. . . ." Report submitted by Pat McCarran, Chairman, U.S. Senate Committee on the Judiciary, Administrative Procedure Act, Legislative History 1944–46, 79th Cong. (July 26,1946).

107.    "[I]t is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." *Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972).

108.    Courts have recognized the importance of the public comment process, which is designed to prevent a person from being required to resort to, or be adversely affected by, significant rulemaking without having the opportunity to participate in that rulemaking. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001).

109.    Here, nothing in the Agencies' application of FIFRA to water filters or its explanation thereof "gave [any] indication that [the agency] was contemplating a potential change" as drastic as reinterpreting substances that protect the filter without a pesticidal effect as pesticides. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1376 (Fed. Cir. 2017). Exh. A, B, & D.

110.    The 1975 Rule and 1976 guidance documents uses vague phraseology, specifically the 1967 if an *"article incorporates a substance or mixture of substances intended to prevent, destroy, repeal, or mitigate any pest, it is considered to be a pesticide*." *See Defendant's Memorandum [Doc. 10].* The EPA also relies on their U.S. EPA, Pesticide Devices: A Guide for Consumers, Pesticides, explaining that if a water filter "contains any substance *intended* to disinfect the water, then the unit is generally considered a pesticide that must be registered in order to be sold and distributed."(emphasis added) *See id.* There is nothing in the 1975, 1976, or in the Guide for Consumers that shows that substances *not intended* to prevent, destroy, repeal, or mitigate pests or *not intended* to disinfect the water are pesticides.

111.    Due to the substantial discrepancy between the inconsistent decisions to label a mechanical filter as a pesticide, and its recent reinterpretation and application of the rule against Plaintiff, the

public was denied the chance to comment on the substance of the latter. That denial violates the APA and warrants vacatur of the SSUROs. *See CSX Transp.*, 584 F.3d at 1083; *Ass'n of Priv. Sector Colls. & Univs. v. Duncan,* 681 F.3d 427, 462 63 (D.C. Cir. 2012).

112.    On information and belief, a full review of the record in this case will evidence that the EPA failed to adequately consider the ramifications of their novel interpretation of the Final Rule as applied to inert silver on the public and the filter industry writ large and failed to adequately consider the financial impact on businesses because the industry lacked requisite notice to comment on the rule as recently interpreted. Exh. A, B, C, & D.

**B.  Count 2: Plaintiff seeks vacatur of the EPA's reinterpretation of the "silver = pesticide" rule because it is Arbitrary, Capricious, and Not in Accordance with Law.**

113.    Under 5 U.S.C. § 706(2)(A), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" The Final Rule is arbitrary, capricious, and not in accordance with law.

114.    Plaintiffs assert that the EPA in its SSUROs have adopted two new irrational rules: a) the use of a registered pesticide in a filter turns the filter into a pesticide; and b) use of silver for any purpose in a filter inexorably leads to a requirement that the filter must be registered as a pesticide.

115.    Without both of these new rules, the SSUROs could not have been issued, and both are irrational substantial departures from  EPA rules since the 1970s.

116.    Under FIFRA, a water filter is a device, as it is an instrument or contrivance intended for trapping, destroying, repelling, or mitigating any pest or any other form of plant or animal life; a pesticide is generally a any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest. *See* 7 U.S.C. Chapter 6 § 136 (definitions).

117.    Based on these definitions, a device is not a pesticide unless it is made of a substance *intended* for destroying pests. The new rules employed by the EPA in issuing the subject SSUROs ignore the "intent" aspect, contrary to the governing statute. Exh. A, B, C, & D.

118.    Thus, irrespective of the procedure that should have been followed by the EPA before adopting these rules, the rules that the EPA are attempting to employ are thus invalid as contrary to FIFRA, and thus should not be enforced.

### C.  Count 3: Plaintiff seeks vacatur for violation of the APA 5 U.S.C. § 706 and for violation of the U.S. Constitution U.S. Const. Amend. V as void for vagueness.

119.    "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V.

120.    Agency regulations bear the "'force and effect of law.'" *Perez*, 575 U.S. at 96.

121.    Thus, agency regulations are subject to the same constitutional limits on vagueness as is legislation. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 254–55 (2012) (indicating that the void-for-vagueness doctrine applies to agency regulations).

122.    "A law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application." *Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980).

123.    The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019); *accord Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

124.    A law must provide "'fair notice' of the conduct a statute proscribes," in order to "guard[] against arbitrary or discriminatory law enforcement[.]" *Sessions*, 138 S. Ct. at 1212; *see Fox Television Stations, Inc.*, 567 U.S. at 253 (judicial vagueness inquiries ensure that regulated parties know what is required of them and that enforcement of the law will not be arbitrary and discriminatory).

125.    The 1975 Rule and 1976 guidance documents uses vague phraseology, specifically the 1967 if an *"article incorporates a substance or mixture of substances intended to prevent, destroy, repeal, or mitigate any pest, it is considered to be a pesticide."* *See Defendant's Memorandum* [Doc. 10]. The EPA also relies on their U.S. EPA, Pesticide Devices: A Guide for Consumers, Pesticides, explaining that if a water filter "contains any substance *intended* to disinfect the water, then the unit is generally considered a pesticide that must be registered in order to be sold and distributed."(emphasis added) *See id.* As discussed above, this is unduly vague for the manufacturers who are attempting good faith compliance with the law, if this statement covers substances intending to destroy pests and disinfect water and those substances that do not intend to destroy pests or not intended to disinfect water. In light of EPA enforcement action conflicting with this statute, it is not remotely clear what devices fall within the ambit of this language if substances not intended to prevent, destroy, repeal, or mitigate pests, or not intending to disinfect the water effects fall within its scope.  Exh. A, B, C, & D.

126.    The law is thus unduly vague, at least as applied in this case, and violates the void-for-vagueness doctrine, necessitating vacatur.

**D.  Count 4: Plaintiff seeks vacatur for violation of the APA 5 U.S.C. § 706 and violation of the U.S. Constitution Art. I, Separation of Powers and the Delegation Doctrine.**

127.    Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

128.    Article I, Section 3 of the U.S. Constitution directs that the president "shall take Care that the Laws be faithfully executed[.]"

129.    A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. CONST. ART. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

130.    "Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* at 756–57.

131.    "'The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress[.]'" *Brackeen v. Haaland*, 994 F.3d 249, 420 (5th Cir. 2021) (quoting *Loving*, 517 U.S. at 758).

132.    As the Fifth Circuit has noted, "the Constitution's first substantive word" places all lawmaking power in Congress and therefore "Congress's statutes define the scope of agencies' power." *Forrest Gen Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019).

133.    Government actions, including agency rules, "are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the legislative branch.'" *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (quoting *INS v. Chada*, 462 U.S. 919, 952 (1983)).

134.    Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

135.    Neither the president nor his subordinates, therefore, may exercise, Congress' legislative power to declare entirely "what circumstances . . . should be forbidden" by law. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418–19 (1935).

136.    The Supreme Court has "reaffirm[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

137.    The EPA, therefore, "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v.FERC*, 661 F.3d 258, 264 (5th Cir. 2011); *id.* ("'Ambiguity is a creature not of definitional possibilities but of statutory context.'")

(quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). 176. Further, an agency cannot create implicit questions "left unresolved" in a statute, "merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Moore v. Hannon Food Serv. Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)).

138.    Delegation must be express; courts cannot "presume that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Contender Farms, L.L.P. v U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (internal citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020), as revised (Aug. 4, 2020).

139.    Congress cannot delegate authority to an agency absent an "intelligible principle" to guide and limit the delegation. *See Jarkesy*, 34 F.4th at 460–61 (citing *Mistretta v. United States*, 276 U.S. 394, 409 (1989)). Accordingly, this Court has deemed it "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta v. U.S.,* 488 U.S. 361, 372–73 (1989) (*citing American Power & Light Co. v. SEC*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946)).

140.    There was no delegation to the EPA to more broadly define "pesticide" to exceed the limits of its congressionally established authority, nor is there any intelligible principle by which such authority could have been delegated. Further, the statute did not set any boundaries, leading to controversy in this case. No reading of 7 U.S.C. § 136(u) shows what Congress intended to set as the boundaries of what a "substance or mixture of substances" are, hence the EPA has wrongly felt free to label a mechanical water filter as a pesticide.

141.    The nature reading of FIFRA leads one to understand that it governs chemical mixtures used to kill pests, and not water filters, whether or not they have silver in them. There exists no evidence to support the idea that Congress would have the EPA regulate mundane carbon filters as though they are pesticides. While FIFRA may have been constitutionally sound until this last year, FIFRA has now become unmoored in this case, and void under the non-delegation doctrine without an intelligible principle, as evidenced by EPA's arbitrary reinterpretation. Exh. A-D.

142.    The reinterpretation is not merely a regulatory change that allows the EPA to enforce FIFRA. The reinterpretation would give the EPA new power over new items that are not contemplated nor regulated under federal law.

**E.  Count 5: Plaintiffs seek declaratory judgment and damages for the EPA's violations.**

143.    Plaintiffs claim here that the EPA violated the APA by arbitrarily and capriciously designating Black Berkey water filters as pesticides with no basis in any record of facts.

144.    Plaintiffs claim here that the EPA violated the APA by exceeding its statutory authority under FIFRA to require pesticide registration by attempting to regulate water filters which do not qualify as pesticides.

i.    <u>The EPA arbitrarily and capriciously designated Plaintiffs' filters as pesticides.</u>

145.    Plaintiffs claim here that the EPA violated the APA by arbitrarily and capriciously designating Black Berkey water filters as pesticides with no basis in any record of facts.

146.    As discussed supra, the APA allows for this Court to review final agency actions. Final agency actions under 5 U.S.C. § 704 include orders of the agency, which are anything relating to interested parties that are not rules. Here, the decision to classify Black Berkey Filters as pesticides applies to one interested party, Berkey, and its allied sales channels. This decision did not undergo notice and comment rule making procedures, nor was it a statement of general applicability to

numerous or all interested parties to FIFRA. Thus, the EPA's decision, expressed here as Stop Sale, Use, or Removal Orders were orders constituting a final agency action.

147.    The EPA's SSUROs (orders) resulted from informal adjudication because there was no public hearing on the record as described in 5 U.S.C. §§ 556 and 557. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (holding that the substantial-evidence standard of review for agency actions did not apply to informal orders). As a result, the standard for review of the order is arbitrariness and capriciousness based on the record the agency considered while creating the order. *See generally, id.* However, if the agency cannot describe its basis for why it flipped its adjudication of the issue in the record of available data it considered, courts view that decision as arbitrary and capricious. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

148.    Here, the EPA provided no record of data nor did it explain its reasoning on any such data for why it suddenly considered Black Berkey Filters as pesticides. This type of flip mirrors the FCC's arbitrary and capricious order in *Fox TV* where the agency could not explain on a record of data why it suddenly changed order on what words were television appropriate and which were prohibited. *See generally*, *id.* In the same way, the EPA originally viewed the filters as pesticide devices, but inexplicably changed its mind, and declared the filters as pesticides, in part by referencing their 1975 and 1976 guidance documents. Exh. A-D. Therefore, the EPA's determination that Berkey filters are pesticides is arbitrary and capricious and the EPA is in violation of 5 U.S.C. § 704–706. The EPA's violations have substantially injured Plaintiffs and require damages, declaratory judgment, and injunctive relief to restore Plaintiffs to the rightful position. Exh. A, B, C, & D.

ii.   The EPA exceeded its authority with a rule that does not comport with FIFRA.

149.   Plaintiffs claim here that the EPA violated the APA by exceeding its statutory authority under FIFRA to require pesticide registration by attempting to regulate water filters which do not qualify as pesticides.

150.   As discussed at 5 U.S.C. § 701, *et. seq.*, the APA allows an interested party to challenge final agency actions for exceeding congressionally granted, statutory authority. Final agency actions under § 704 include orders of the agency, which are anything relating to interested parties that are not rules. Here, the decision to classify Berkey Filters as pesticides applies to interested parties: Berkey, and its distribution channel partners. The decision did not undergo notice and comment rule making procedures, nor was there a statement of general applicability to numerous or all interested parties to FIFRA. Therefore, the EPA's decision was an order and final agency action subject to review under 5 U.S.C. § 704–06.

151.   For the EPA to have authority to require product registration under FIFRA, the targeted product must be a pesticide. 7 U.S.C. § 136a. FIFRA defines pesticides in § 136(u) as chemical products intended to destroy pests. The EPA further defined "pesticides" to exclude animal drugs and feed. 40 C.F.R. § 152.3. Relevant here, the EPA promulgated 40 C.F.R. § 152.10 to clarify that products not <u>intended</u> to destroy pests are not pesticides.

152.   The legislative history of FIFRA and the regulations promulgated by the EPA all indicate that FIFRA is designed to regulate chemical compounds, particularly for use in agriculture, not devices. For example, in the last major overhaul of FIFRA in 1978, the Senate Committee on Agriculture, Nutrition, and Forestry conducted a bill analysis and published a report on the proposed changes. Staff of S. Comm. on Agric., Nutrition, and Forestry, 95th Cong., *Comm. Rep. on Fed. Pesticide Act of 1978* (Comm. Pr. 1979).

153.    In the section on the history of FIFRA, the Committee noted that Congress passed FIFRA originally to deal with an explosion in the use of chemical agricultural pesticides in the United States. *Id.* at 189–90. The particular pesticides that Congress wanted to target were DDTs and herbicides. *Id.* at 190. Continued concern over the use of pesticides on agricultural products that ended with human consumption drove further amendments. *Id.* at 190–91. Notably absent from consideration were any physical devices that Congress considered to be "pesticides." *See generally, id.* Instead, Congress was concerned with chemical cocktails.

154.    Further, the EPA has promulgated regulations to define certain innocuous products that would otherwise be pesticides that are excepted from registration. 40 C.F.R. § 152.25. Some examples include embalming fluids, castor oil, pheromone traps, and peppermint oil. *Id.* None of these excepted pesticides even remotely resemble a water filter.

155.    Regardless, none of the EPA's legislative history clarifies why substances not intended to repel pests are now magically pesticides, rather than devices or treated articles. Hence, the EPA's attempt to force Berkey to register its water filters as pesticides exceeds the bounds of the congressionally granted authority found in FIFRA. Exh. A, B, C, & D. Water filters are not chemical compounds used to eliminate pests. Use of a silver treatment to protect a mechanical filter does not change a filter into a chemical substance to destroy pests for purposes of FIFRA and the EPA. Berkey filters are mechanical products designed to make water more palatable for human consumption. Hence, they do not fall within the scope of FIFRA and the EPA may not require registration as pesticides. Therefore, the EPA is in violation of 5 U.S.C. § 704–06. The EPA's violations have substantially injured Plaintiffs and require damages, declaratory judgment, and injunctive relief to restore Plaintiffs to their rightful position.

**F. Count 6: Procedural *Due Process* claim against the EPA for its violation of Plaintiffs' APA rights notice and comment rights and 5th Amendment Procedural Due Process.**

156.   The EPA violated Plaintiff's procedural due process by failing to provide notice or opportunity to be heard when arbitrarily and capriciously relabeling Berkey products from "pesticide devices" to "pesticides" without explanation or guidance. Berkey Products' and Plaintiffs' good name and reputation were damaged by EPA's lack of explanation and cooperation with Plaintiffs in issuing a stop order for Berkey Products with no rational explanation.

157.   The arbitrary and capricious procedures of the EPA involved no notice or opportunity for Plaintiffs to be heard and resulted in a 50% decrease in market share of Black Berkey elements and a 90% decrease in market share of Big Berkey filtration systems since February 2023 due to the resulting harm to Berkey Products' good name, reputation, and perceived integrity.

   i.   <u>The EPA failed to follow the APA by denying notice and comment before simply concluding that Berkey filters are no longer pesticide devices, but pesticides themselves.</u>

158.   As noted above, the EPA provided no notice or opportunity to be heard when in May 2022 it labeled Berkey Products as "pesticide devices", then seven months later without explanation or published guidance, again relabeled Berkey Products, this time as "pesticides." Plaintiffs received no explanation of the EPA's reinterpretation of Berkey Products, nor even a notice, let alone an opportunity to be heard. Exh. A, B, & D. Because of EPA's relabeling, the EPA issued multiple stop orders for Berkey Products in December 2022, which resulted in a 50% decrease in market share of Black Berkey elements and a 90% decrease in market share of Big Berkey filtration systems. Exh. A & D.

159.   The EPA shut Plaintiffs out of any opportunity to participate in the reinterpretation of its rules, gave no public notice or guidance, and afforded no opportunity to be heard or solicit public comments; Plaintiffs suffered harm to their product's reputation and good name, resulting in more than a 50% decrease in market share of Black Berkey elements and 90% decrease in market share

of Big Berkey filtration systems since February 2023, while also encouraging parasitic knock-off and counterfeit filters which are abundantly available and completely ignored by the EPA. Exh. A, B, & D.

160.    The EPA did not satisfy notice and comment rulemaking requirements and violated Plaintiff's procedural due process rights by not providing notice or an opportunity to be heard. Plaintiffs will continue to suffer extreme hardship in having to spend valuable time and money to both clear their good name and comply with whatever irrational requirements the EPA arbitrarily adopts next.

ii.    The EPA violated Plaintiffs' procedural due process rights arbitrarily and capriciously, and while abusing its discretion, when issuing SSURO's alleging Berkey Products were pesticides that must be registered without proper notice and comment based on foreign non-pesticidal claim statements.

161.    The EPA reclassified Berkey Products as a pesticide without notice, opportunity to be heard, guidance, or properly followed notice and comment rulemaking, resulting in harm to Plaintiffs' good name and reputation. This violates Plaintiffs' procedural due process rights. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). *Munn v. U.S. Dept. of Lab.*, 714 Fed. Appx. 387, 390 (5th Cir. 2018)(unpublished)(Federal court may exercise jurisdiction to consider a substantial constitutional claim, such as a claim that an agency's procedures violated due process.)

162.    There was no rational basis for the EPA's reclassification, nor is there any public record or guidance regarding what evidence was considered when the EPA made the decision to reclassify Berkey products. No reasonable person can be expected to abide by rules that may be arbitrarily and capriciously reinterpreted without notice or published guidance.

163.    Due process requires consideration of the private interest at stake, the risk of erroneous deprivation of that interest, and the government's interest in using the particular procedures. *See id.* Plaintiffs' private interest to be free of wrongful interference in the operations of their business and needless damage to their professional reputation is at stake, and was erroneously deprived by

the EPA stop order. The government can have no interest in using arbitrary and capricious actions that violate notice and comment rulemaking and procedural due process. No rational person can justify a governmental interest in the procedures that gave rise to this suit.

164.    After nearly 25 years of production without EPA interference, Berkey discovered that an obscure rule had been reinterpreted by the EPA to apply to Plaintiffs and that Plaintiff have thus been rendered non-compliant with rules of which they were previously unaware. Exh. A-D. The Court should declare that the EPA acted arbitrarily and capriciously, did not satisfy notice and comment rulemaking requirements under the APA, and violated Plaintiffs' procedural due process rights. The Court should also enjoin the EPA from enforcing its stop orders against Berkey filters.

### G. Count 7: Regulation of Gravity-Fed Mechanical Water Filters by Federal Agencies is Unconstitutional under the Ninth and Tenth Amendments.

i.    <u>Early American citizens freely filtered water using analogically similar filters to Berkey's</u>.

165.    As detailed in the fact section above, early citizens of this country had access to and used gravity-fed mechanical filters without seeking permission from any government. Plaintiffs assert that any attempt by the federal government to regulate such devices would have been rejected, as the administrative state was more than a century into the future, and potable water was not generally provided by government systems.

166.    Plaintiffs assert that, contrary to the several SSUROs issued by Tokarz in connection with Berkey filters, an establishment constructing mere devices that do not employ substances as pesticides is not required to seek establishment numbers and be regulated by the EPA. Exh. A, B, C, & D. Because the federal government has not passed a law requiring that action, Plaintiffs assert that they are not required to pretend otherwise in order to buy peace with rogue EPA actors.

ii.    <u>The Tenth Amendment should protect Berkey from the EPA/Tokarz's overreach.</u>

167.    If, however, this Court sees in FIFRA a requirement for ordinary mechanical filters to be regulated, then Plaintiffs assert that FIFRA is unconstitutional, at least as applied to their products.

Plaintiffs' issues may not be as grand as the overreach discussed in *Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S. Ct. 661 (2022), where the Supreme Court stopped OSHA's effort to force vaccination on every employee of more than 100 employers, but the difference is in quantity, not quality, as the plaintiffs in both cases cited the Tenth Amendment to argue that the agency in question had overstepped its boundaries.

iii.   <u>The Ninth Amendment should protect Berkey from the EPA/Tokarz's interpretation.</u>

168.   Additionally, Plaintiffs assert that because citizens in the early years of the United States enjoyed unfettered ability to use mechanical filter products without regulatory interference, any ambiguity in the EPA's authority should be answered by the Ninth Amendment's command to recognize that rights enjoyed by its citizens at the time of the Bill of Rights' adoption should be protected until, at the very least, a clearly expressed curtailing statute is passed by Congress.

169.   If the Ninth Amendment means anything at all, it should require courts to interpret vague regulations away from restricting common freedoms enjoyed when the Bill of Rights was adopted, rather than deferring to state agencies which rarely know boundaries. Plaintiffs recognize that water filters which use exotic processes and chemical treatments that did not exist when the Bill of Rights was passed may not enjoy the protection of historical use, but certainly every water filter that uses a gravity-fed element comprising a porous medium to capture contaminants should be protected from government interference.

## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTION

170.   Plaintiffs originally sought a temporary restraining order in their Original Complaint. As the events have developed, and as the EPA has responded, Plaintiffs believe that a preliminary injunction, or in the alternative, a permanent injunction is sufficient. Plaintiffs request a preliminary injunction.

171.    Plaintiffs have suffered irreparable injury, monetary damages alone are not adequate, an injunction is necessary to prevent future harm. Plaintiffs seek a preliminary injunction preventing enforcement of the EPA's determination that Berkey filters are pesticides and the SSUROs subject of this suit.

172.    A party seeking injunctive relief must demonstrate by a clear showing: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs any harm to the nonmovant that may result from the injunction; and (4) that the injunction will not undermine the public interest. *See Smith v. Tarrant County College Dist.*, 670 F. Supp. 2d 534, 537 (N.D. Tex. 2009). Plaintiffs believe that these elements are met, and Plaintiffs are entitled to a preliminary injunction to stop enforcement of the SSUROs, or in the alternative, an injunction to stop the EPA from issuing further SSUROs on this issue until the matter can  a permanent injunction, as follows.

      i.    <u>Plaintiffs will likely succeed on the merits.</u>

173.    Plaintiffs have standing in this case by their business relationship with SSURO entities and licensing agreements granting intellectual property rights from the JBS Trust for royalty payments from Berkey International, LLC and NMCL. Exh. A & D. Plaintiffs emphasize that the EPA acted arbitrarily and capriciously in clear error of judgment because Berkey Products are mechanical filters and not pesticides. Exh. A & D. At the worst, Berkey Products are treated articles or pesticidal devices because they use a registered pesticide to protect the mechanical filter, and not for a pesticidal purpose. *See Exhibit E, Sealed Declaration of Jim Shepherd.*  Plaintiffs show EPA provided no opportunity for notice and comment before declaring something that contains a substance to protect the filter rather than intending to destroy pests as being relabeled as pesticides. Exh. A & D. Further, the SSUROs were issued arbitrarily, capriciously, and in clear error of judgment; Plaintiffs should not be required to register their products as pesticides. Plaintiffs have

been injured by the EPA's actions. Exh. A & D. Plaintiffs will suffer more irreparable harm if the SSUROs are continued, and EPA continues to arbitrarily require pesticide registration of Berkey Products.

       The EPA arbitrarily and capriciously designated Plaintiffs' filters as pesticides.

174.    Plaintiffs claim here that the EPA violated the APA by arbitrarily and capriciously designating Black Berkey water filters as pesticides with no basis in any record of facts and in clear error of judgment. The EPA labeled products subject to Plaintiffs' intellectual property protection entitling the JBS Trust to gross sales and royalty payments as pesticides arbitrarily, capriciously, and in clear error of judgment. Exh. A, B, & D.

175.    As discussed supra, the APA allows for this Court to review final agency actions. Final agency actions under 5 U.S.C. §§ 704, 706(2)(A) include orders of the agency, which are anything relating to interested parties that are not rules. Here, the decision to classify Black Berkey Filters as pesticides applies to one interested party, Berkey, and its allied sales channels, this decision did not undergo notice and comment rule making procedures, nor was it a statement of general applicability to numerous or all interested parties to FIFRA. Thus, the EPA's decision, expressed here as Stop Sale, Use, or Removal Orders were orders constituting a final agency action.

176.    The EPA's SSUROs (orders) resulted from informal adjudication because there was no public hearing on the record as described in 5 U.S.C. §§ 556 and 557. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (holding that the substantial-evidence standard of review for agency actions did not apply to informal orders). Exh. A, B, & D. As a result, the standard for review of the order is arbitrariness and capriciousness based on the record the agency considered while creating the order. *See generally, id.* However, if the agency cannot describe its basis for why it flipped its adjudication of the issue in the record of available data it considered,

courts view that decision as arbitrary and capricious. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

177.    Further, the statements relied on in the SSUROs are from foreign websites that neither Plaintiffs nor SSURO recipients have no control over. Exh. A & D. Additionally, the statements relied on in the SSURO show no pesticidal claim, but only mechanical filters using a treated article to protect the filter and not to have a pesticidal effect on the water. Exh. A; B6-11, & D. The EPA cannot show any pesticidal claim by the SSURO recipients or Plaintiffs. Exh. A, B, & D. The EPA provided no guidance or notice and comment opportunities for their enforcement of labeling substances intended to protect the devices as pesticides rather than treated articles or pesticide devices. Exh. A & D. EPA's actions are arbitrary, capricious, with no basis in any record of fact, and in clear error of judgment. Exh. A & D. Due to the EPA's SSUROs, payments due to Plaintiffs' protected products have ceased in the regular course of business and injury will only increase with the SSUROs in place. Exh. A & D. The result of SSUROs damages the reputation of the protected products and literally stops sales based on those products. Exh. A & D. The EPA relied on foreign websites that made no pesticidal claims that the SSURO recipients had no control over. Exh. A, B, & D. The EPA has not explained why something not intended to have a pesticidal effect but is meant to protect the filter is now a pesticide. Exh. A, B, & D. The EPA's violations have substantially injured Plaintiffs and require damages, declaratory judgment, and injunctive relief to restore Plaintiffs to their rightful position. Exh. A & D.

178.    Further, the EPA provided no record of data, nor did it explain its reasoning on any such data for why it suddenly considered Black Berkey Filters as pesticides. This type of flip mirrors the FCC's arbitrary and capricious order in *Fox TV* where the agency could not explain on a record of data why it suddenly changed order on what words were television appropriate and which were prohibited. *See generally*, *id.* In the same way, the EPA originally viewed the Filters as pesticide

devices, but inexplicably changed its mind, and declared the Filters as pesticides, allegedly based on their readings of 1975 and 1976 guidance documents. Exh. A, B, & D. *See Defendant's Memorandum* [Doc. 10]. Therefore, the EPA's determination that Berkey filters are pesticides is arbitrary and capricious and the EPA is in violation of the APA reviewable under 5 U.S.C. § 704–706. Exh. A, B, & D. The EPA's violations have substantially injured Plaintiffs and require damages, declaratory judgment, and injunctive relief to restore Plaintiffs to the rightful position. Exh. A, B, & D.

> Claim 2: The EPA exceeded statutory authority acting arbitrarily, capriciously, and in clear error of judgement in issuing their SSUROs labeling Berkey Products as pesticides requiring registration while relying on foreign non-pesticidal claims not under the control of SSURO recipients.

179.   Plaintiffs claim here that the EPA violated the APA by exceeding its statutory authority under FIFRA in clear error of judgment to require pesticide registration by issuing their SSUROs attempting to regulate water filters which do not qualify as pesticides.

180.   As discussed at 5 U.S.C. § 701, *et. seq.*, the APA allows an interested party to challenge final agency actions for exceeding congressionally granted, statutory authority. Final agency actions under § 704 include orders of the agency, which are anything relating to interested parties that are not rules. Here, the decision to classify Berkey Filters as pesticides applies to interested parties: Berkey, and its distribution channel partners. Exh. A, B, & D.  The decision did not undergo notice and comment rule making procedures, nor was there a statement of general applicability to numerous or all interested parties to FIFRA. Therefore, the EPA's decision was an order and final agency action subject to review under 5 U.S.C. § 704–06.

181.   For the EPA to have authority to require product registration under FIFRA, the targeted product must be a pesticide. 7 U.S.C. § 136a. FIFRA defines pesticides in § 136(u) as chemical products intended to destroy pests. The EPA further defined "pesticides" to exclude animal drugs

and feed. 40 C.F.R. § 152.3. Relevant here, the EPA promulgated 40 C.F.R. § 152.10 to clarify that products not <u>intended</u> to destroy pests are not pesticides.

182.    The 1975 Rule and 1976 guidance documents uses vague phraseology, specifically the 1967 if an "article incorporates a substance or mixture of substances intended to prevent, destroy, repeal, or mitigate any pest, it is considered to be a pesticide." Exh. C-2. *See Defendant's Memorandum* [Doc. 10].  The EPA also relies on their U.S. EPA, Pesticide Devices: A Guide for Consumers, Pesticides, explaining that if a water filter "contains any substance intended to disinfect the water, then the unit is generally considered a pesticide that must be registered in order to be sold and distributed."(emphasis added) Exh. C-6. *See id*. The guidance cited by the EPA is clear that substances *not intended* to prevent, destroy, repeal, or mitigate any pest, and substances that are *not intended* to disinfect the water are not pesticides. Yet, the issued SSUROs rely on statements that show substances not intended to prevent, destroy, repeal, or mitigate any pests and substances that are *not intended* to disinfect the water. Exh. A, B, C, D, & E. The issued SSUROs were issued against bases arbitrarily, capriciously, and in clear error of judgment. 5 U.S.C. § 706(2)(A).

183.    The issued SSUROs cite a foreign website that states "Yes, silver is used as an antimicrobial to self-sterilize the Black Berkey® elements. Testing was conducted both internally and by Analytical Services, Inc. to ensure that the silver used does not leach into the purified water." Exh. B-4, para. 26. Neither Plaintiffs nor the SSURO recipients have ever had ownership, custody, or control over the European website when it wrongly made the above claim. Exh. A, B, & D. Further, the statement shows that silver is not used to disinfect the water but to protect the filter. Exh. B. The EPA condemns the SSURO recipients for being pesticides that allegedly make pesticidal claims while simultaneously relies on non-pesticidal statements not made by the SSURO recipients regarding such devices that none of the SSURO recipients have control over. *See* Exh.

A, B, & D; *Plaintiff's Reply to Defendant's Memorandum.* Berkey Filters are mechanical filters that include a registered pesticide, Berkery filters may be a treated article, or pesticide device, but not a pesticide. *See* Exh. E, *Sealed Declaration of Jim Shepherd.* Certainly, the EPA cannot rely on non-pesticidal statements made by foreign parties not controlled by SSURO recipients. The EPA cannot point to any pesticidal claim made by the SSURO recipients when issuing their SSUROs. Exh. A, B, & D. The EPA acted arbitrarily, capriciously, and in clear error of judgment when issuing their SSUROs and labeling Berkey products as a pesticide.

184.    None of the EPA's cited legislative history clarifies why substances not intended to repel pests are now magically pesticides, rather than devices or treated articles. Hence, the EPA's SSUROs and attempt to force Berkey to register its water filters as pesticides is arbitrary, capricious, and in clear error of judgment. Use of a silver treatment to protect a mechanical filter does not change a filter into a substance to destroy pests for purposes of FIFRA and the EPA. Exh. C-2 & C-6. Substances not intended to disinfect the water or not intended to prevent, destroy, repeal, or mitigate any pest are not pesticides. Exh. C-2 & C-6.

185.    The EPA cannot base their SSUROs on statements relating to such devices not under the control of the recipients. The EPA cannot base their SSUROs on non-pesticidal claims. The EPA cannot take a foreign website with knockoff products that do not even have the same name as the official products or make a pesticidal claim and stop all of the SSURO recipients' operations for registration.[10] Therefore, the EPA violates the APA by acting arbitrarily, capriciously, and in error of judgment, reviewable under 5 U.S.C. § 704–06. The EPA's violations have substantially injured Plaintiffs and require damages, declaratory judgment, and injunctive relief. Exh. A, B, & D.

---

[10] In *Defendant's Memorandum's Appendix* [Doc. 11], the EPA points to official Berkey website explanations of their filters. The entire document shows the success of the mechanical filtration system, but the EPA attempts to use it to show pesticidal claims by Berkey. Plaintiffs would ask the EPA to explain why they chose to rely on the foreign website rather than the documents attached to their memorandum. Berkey makes no pesticidal claims.

ii.   Plaintiffs will suffer irreparable harm to Plaintiffs if the injunction is not granted.

186.    Plaintiffs suffered a real injury when the EPA issued a stop sale order to Berkey International. Due to the SSUROs, royalty payments to JBS Trust for sales of products bearing the IP subject to the licensing agreements of JBS Trust have ceased from NMCL and Berkey International, LLC. Exh. D. Specifically, the license agreement requires Berkey International, LLC to pay 3.5% of gross sales annually and both NMCL and Berkey International to pay royalty payments of 5% of all sales of those protected by the IP to the JBS trust. Exh. D. Each day the SSUROs are in place the JBS Trust is harmed through the decreased royalty payments due to SSURO recipients not being allowed to sell licensed products. Exh. D. The losses of these royalty payments in the regular course of business causes Plaintiff to suffer irreparable injury, which will only worsen substantially over time as expenses accumulate during the SSUROs. Exh. A, B, & D. Further, Plaintiffs' distributors have questioned, with some merit, whether Berkey has long term stability and viability given the EPA's campaign to make it jump through ever more ridiculous hoops. Exh. A, B, & D.

187.    The SSUROs have caused a massive loss in market share to competitor filtration systems since the EPA began issuing SSURO's against Berkey products. According to Amazon's statistics in February of 2023, NMCL's flagship Big Berkey system alone was clearly the market leader with sales on Amazon approximately 2.5 times that of the closest competitor. Since then, sales have suffered a decrease in sales of approximately 90%. Big Berkey systems have fallen below two competitors, which are now selling nearly three times the volume that Big Berkey systems are selling. Upon information and belief, Berkey filtration systems have had the same attrition on other platforms such as Walmart.com, Ebay.com, etc. Exh. A, B, & D.

188.    To date, Plaintiffs have lost more than 90% of their market share in their flagship Big Berkey systems, massive damage to reputation and brand in both the eyes of customers and

distributors that will take years to repair and have lost untold opportunities to gain new distributors and customers. Exh. A, B, & D. Each of these injuries is a real, significant injury that threatens Berkey's existence without this Court's intervention to prevent the EPA from continuing to exceed its statutory authority by declaring Berkey Black Water Filters to be pesticides. Exh. A, B, & D.

189. Because of the EPA's SSUROs, Berkey Int'l has been forced to release **ALL** of its employees. Further, every day this Court does not issue an injunction adds to the substantial resources Berkey Int'l will have to invest to hire and train new employees. Every day of delay is another former employee finding work elsewhere, increasing the resource cost on Berkey. Such an expense is real but cannot be adequately measured for a legal remedy to place the Plaintiffs back in the rightful position. Exh. A, B, & D.

190. Because of the SSUROs, Berkey Int'l is unable to purchase products from its vendors, which threatens decades of professional relationships. One vendor alone was forced to lay off over 425 skilled workers, which it cannot replace without long-term training. If the vendors are not able to rehire such workers before they find new jobs, the vendors will suffer irreparable damage to their operations. Exh. A, B, & D.

191. Because of the EPA's SSUROs, Berkey Int'l has $38,500,000 in wholesale inventory that it is unable to manufacture or sell. Storage costs exceed $63,000 per month. Exh. A, B, & D.

192. Because of the EPA's SSUROs, Black Berkey filters have experienced a massive loss in market share to knock-off replacement filters. The imitation Black Berkey elements are simply look-alike filters that have no testing or performance data. Their only claim is that they fit Berkey filtration systems or that they are replacement filters for Berkey elements. American consumers' health may be harmed when they use such filters that fail to provide Berkey filtration performance as the customers expected. Exh. A, B, & D.

193.    Because of the SSUROs, Plaintiffs distributors and manufacturers not being able to sell products results in injury to JBS trust through decreased total amount on the 3.5% payment on gross sales from Berkey International, LLC, and the 5% royalty payment from NMCL and Berkey International, LLC. Exh. A & D. Such payments have ceased because no products are allowed to be sold due to the SSUROs. Exh. A & D. Further, such payments will decrease compared to the payments made in the regular course of business because SSUROs against Berkey International, LLC and others. Exh. A & D.

194.    During the first six months of 2022, genuine Berkey products were clearly the market leader. Since the first SSURO was issued in December of 2022, knock-off replacement filters are now the market leaders with twice the market share as the original and genuine Berkey elements. Exh. A & D.

195.    Plaintiff Shepherd understands that Berkey filtration systems have had the same attrition on other platforms such as Walmart.com, Ebay.com, etc. Exh. A & D.

196.    To date, NMCL has been hamstrung by the EPA issues preventing it from educating the public on the dangers of using untested knock-off filters that could endanger their health and safety, as EPA agents refuse to give approval to James Enterprises' and NMCL's new websites. Nor has the EPA informed them specifically of what they can and cannot say, therefore NMCL cannot make comments without any certainty that they are not committing additional violations. For example, Region 8 has stated that NMCL is making pesticide statements in the public record in response to a lawsuit. However, when analyzed by NMCL, its agents could not find any pesticide claims. Exh. A B, & D.

197.    Because of the EPA's SSUROs, Berkey has been prevented from supplying its international Dealers even though the EPA has no regulatory authority outside of the United States.

Exh. A B, & D. The SSUROs damage NMCL and the Berkey brand's good name and reputation in the global marketplace. Exh. A B, & D.

198.    NMCL has offered its customers the option of utilizing third party ceramic filters, in lieu of Black Berkey filters, for over 25 years in the following systems: *Travel Berkey Water Filters, Big Berkey Water Filters, Royal Berkey Water Filters, Imperial Berkey Water Filters, and Crown Berkey Water Filters*. Yet, the EPA has indicated that going forward, it would likely not allow the use of the Berkey trademark in association with NMCL's filters, which would shut down sales of wholly unobjectionable ceramic filters that are not as issue. Exh. A, B, & D.

199.    The EPA's SSUROs have left NMCL in a state of confusion. As previously mentioned on or about February 3rd, 2023, the EPA issued an SSURO to Vendor B, an OEM manufacturer for NMCL and on or about May 8, 2023, Tokarz (Region 8) issued an SSURO in a different region (Region 2) on Berkey Int'l (Vendor A). Exh. A, B-6, & C.

200.    On or about May 26, 2023, Region 4 of the EPA terminated the Stop Sale order on Vendor B allowing it to manufacture and sell Berkey filter products as treated articles, including the Travel Berkey, Big Berkey, Light Berkey, Royal Berkey, Imperial Berkey, Crown Berkey and Black Berkey elements. However, the SSURO on Berkey Int'l remains in effect, preventing it from manufacturing and selling those same products as treated articles. This places NMCL in a precarious position where it can purchase and market Black Berkey Products and Systems from one of its OEM manufacturers in Region 4 while at the same time it is prohibited from purchasing or selling those same products from another OEM manufacturer in Region 2. Exh. A, B, & D.

201.    No adequate legal remedy exists to make Plaintiffs whole. Again, the EPA's campaign against Berkey filters has directly caused Plaintiff gross sales payments and royalty payments in the regular course of business, massive losses to market share to products sold under Plaintiffs' intellectual property, to sales revenue, to brand and reputation, and of new customers while being

drowned with massive irrecoverable business expenses. No one can honestly contest these are real injuries, yet each injury is of a nature that cannot be measured accurately in monetary terms to place the Plaintiffs in the rightful position. Exh. A, B, & D. Therefore, the legal remedy of traditional compensatory damages is inadequate to remedy Plaintiffs' injuries, requiring this Court to grant equitable relief in the form of a temporary injunction to prevent irreparable harm before this Court holds an evidentiary hearing on Plaintiffs' petition for a preliminary injunction.

    iii.   <u>The Defendants suffer no hardship if this Court grants an injunction.</u>

202.   Defendants suffer no hardship from a preliminary injunction. Berkey has sold its trade secret Black Berkey Filters on the market for two decades without an issue. Defendants considered Plaintiffs to be a manufacturer of pesticide devices, not pesticides, up until late 2022, when, without adequate explanation, they suddenly reversed course. When this Court grants the preliminary injunction, the EPA will suffer no prejudice in its investigation and its enforcement efforts against legitimate pesticides will continue unabated as FIFRA mandates.

203.   As described above, the public is currently being harmed by the militant stance of the EPA as it prosecutes Berkey products, making Berkey filters difficult to obtain while knock-offs and counterfeit filters proliferate in the vacuum left by the genuine product.

204.   To state it another way, the EPA is not capable of stopping the knock-offs and counterfeits, which are available on multiple global sources. The choice before the EPA and this Court is whether the EPA can shut down Berkey and prevent quality tested products from being offered for sale, or leave the marketplace to untested knock-offs and counterfeits.[11]

---

[11] See, e.g., https://www.alibaba.com/product-detail/BB9-2-Black-Purification-Element-Water_1600431948291.html?spm=a2700.galleryofferlist.normal_offer.d_title.1d8a114eJp7Mbk (July 27, 2023).

    iv.    <u>Plaintiffs will suffer extreme hardship if this Court does not grant an injunction.</u>

205.    By contrast, Plaintiffs will suffer extreme hardship if this Courts refuses to grant an injunction. Plaintiffs face irreparable royalty payment loss, market share loss, sales revenue loss, brand and reputational loss, and loss of new customers while being drowned with massive irrecoverable legal and business expenses, damage to brand and reputation, and the continuing loss of new customers. Exh. A, B, & D.

206.    Further, the SSUROs banning the sale of Berkey licensed products results in injury to JBS trust through decreased total amount on the royalty payments on gross sales from Berkey International, LLC, and the royalty payments from NMCL and Berkey International, LLC. Such payments have ceased because no products are allowed to be sold due to the SSUROs. Exh. D. Lastly, offhand comments from Tokarz suggest that a SSURO could come at any minute to NMCL, which would have a far-reaching consequence. Exh. A, B, & D.

207.    Ongoing enforcement efforts against Berkey filters, if left unchecked, will continue to cause these injuries. As the EPA can show no damage that Berkey filters have caused in 25 years, Berkey filters should be allowed to continue to be sold while the dispute is resolved. Conversely, the EPA should not be allowed to starve Berkey with Stop Orders designed to bring its sellers to their economic knees and force capitulation that is unwarranted based on the merits of the orders, but in practical terms are tantamount to victory. Exh. A, B, & D.

    v.    <u>The public interest supports the requested preliminary injunction.</u>

208.    Public interest demands that administrative states all over the country properly comply with constitutional and statutory bounds. Public interest does not support arbitrary, capricious, or abusive agency actions taken without notice, comment, guidance, or explanation. 5 U.S.C. § 706(2)(A). No reasonable person wants government agencies to have carte blanche authority to change their own interpretations of the rules without warning or notice to affected parties.

209.    Citizens in a purportedly free country are supposed to have a restrained, transparent, and respectful government, not some leviathan working in the shadows. Producers' and entrepreneurs' incentives to provide products and new goods cannot survive in an economy where they may be subject to arbitrary and ever-changing regulations that will destroy any hope for profit and survival. A regulatory agency run amok with power raises the cost of business for everyone.

210.    Because the public will find imitation filters, which are available even if Berkey's filters are made unavailable by dictatorial fiat, the EPA should consider the real-world impact to the public that is occurring when it acts without addressing the entirety of the market.

211.    Further, Berkey Products have been in service for over twenty-five years and there has been no notable harm to the environment through the sales of official Berkey Products subject to the SSUROs. The success of Berkey Products has shown the public interest in supporting viable and successful safe mechanical water filters for over twenty-five years.[12] Exh. A, B, & D.

    vi.    <u>Bond</u>

212.    Because the preliminary injunction would place so little burden on the Defendants and provide such great relief to the Plaintiffs, Plaintiffs request this court set the bond at $100, if at all.

**A. Plaintiffs seek a Preliminary Injunction and Permanent Injunction.**

213.    Because of the irreparable injury that Plaintiffs will suffer before trial and the inadequacy of legal remedies, Plaintiffs seek a preliminary injunction, as argued supra. Additionally, Plaintiffs pray for a permanent injunction after trial to enjoin the EPA's illegal action.

214.    In the alternative, if the Court chooses not to issue the injunction requested, Plaintiffs ask that the Court issue an injunction preventing any additional SSUROs from the EPA on this matter, to allow NMCL to have a chance of surviving these new regulations while working through them.

---

[12] In *Defendant's Memorandum* [Doc. 10] the EPA attempts to use an unadjudicated class action lawsuit in its beginning stages, where NMCL has yet to present its case, to smear Berkey products and their reputation.

## X.    PRAYER

In addition to the preliminary injunction described above, upon trial and final judgment of this

Court, Plaintiffs pray this Court award the following:

a. a declaratory judgment pursuant to 28 U.S.C. § 2201 that EPA exceeded its statutory authority under FIFRA when it attempted to require Plaintiffs to register their Black Berkey Water Filters as pesticides;

b. a declaratory judgment pursuant to 28 U.S.C. § 2201 that EPA violated Plaintiffs 5th Amendment due process rights by failing to meet APA and constitutional requirements when changing the rights and duties of the Plaintiffs as to their Berkey Water Filters;

c. preliminary, and permanent injunctive relief pursuant to 28 U.S.C. § 2202 enjoining the EPA from enforcing FIFRA pesticide registration requirements against Berkey Water Filters and set aside the relevant SSUROs;

d. a declaratory judgment pursuant to 28 U.S.C. § 2201 that 7 U.S.C. § 136(u) is void for vagueness;

e. a declaratory judgment pursuant to 28 U.S.C. § 2201 that 7 U.S.C. § 136(u) as unconstitutional delegation by an unintelligible principle and that does not set the boundaries of this delegated authority. *See Mistretta v. U.S.*, 488 U.S. 361, 373 (1989).

f. a declaratory judgment pursuant to the Ninth Amendment and 28 U.S.C. § 2201 that the EPA cannot interpret FIFRA such that Berkey water filters must comply with EPA's registration process, as FIFRA does not clearly require mechanically operating filters to be governed by the EPA, and further, Berkey filters are not pesticides;

g. a declaratory judgment pursuant to the Tenth Amendment and 28 U.S.C. § 2201 that the EPA cannot require Berkey's manufacturers and distributors to register with the EPA merely on the basis that they are manufacturing or selling mechanical filters, such as Berkey products, which do not utilize pesticides to kill pathogens in the water;

h. a declaratory judgment pursuant to 28 U.S.C. § 2201 that 7 U.S.C. § 136(u) is unconstitutional under the 9th, and 10th amendments as United States citizens have unenumerated rights enjoyed predating the Constitution and cannot be regulated by Congress;

i. general damages, special damages for lost market share and sales revenues, lost employee and vendor employee expertise, lost new customers, massive irrecoverable business expense losses and damage to the good Berkey Brand name directly attributable to Defendants, or in the alternative, nominal damages should other damages be unavailable;

j. attorney's fees and costs of court because of this action; and

k. such other and further relief that the Court deems just and proper.

Respectfully submitted,

*/s/Warren V. Norred*
Warren V. Norred, warren@norredlaw.com, Texas Bar Number: 24045094
Norred Law, PLLC; 515 E. Border St.; Arlington, TX 76010
(817) 704-3984 (Office); (817) 524-6686 (Fax)
*Counsel for Plaintiffs*

<u>ATTACHMENTS:</u>
Exhibit A: First Declaration of James "Jim" Shepherd

Exhibit B: Declaration of Susan Spaar
    B-1: Tokarz Email Thread (May 1, 2022)
    B-2: Tokarz EPA Close Out Letter (May 5, 2022)
    B-3: Texado Establishment Number, 30-Day Report Email Thread (May 2022)
    B-4: SSURO to James Enterprises, FIFRA-08-2023-0011 (December 27, 2022)
    B-5: Tokarz Email Seeking Documents (December 2, 2022)
    B-6: SSURO to Vendor B (FIFRA-04-2023-0700 (February 3, 2023)
    B-7: SSURO to Fritz Wellness, FIFRA-08-2023-0015 (February 27, 2023)
    B-8: SSURO to Eden Valley Farms LLC, FIFRA-08-2023-0014 (March 6, 2023)
    B-9: SSURO to Mountain Mama Natural Foods, Inc., FIFRA-08-2023-0017 (March 7, 2023)
    B-10: SSURO to Good Earth Natural Foods Co., FIFRA-08-2023-0037 (May 2, 2023)
    B-11: SSURO to Berkey Int'l, FIFRA-08-2023-0038 (May 8, 2023)
    B-12: EPA Order to Amazon and eBay, including Updated List
    B-13: Rejected Packaging, including Lake Image
    B-14: Communications Regarding Damage to Reputation
    B-15: Amazon Counterfeit Documentation
    B-16: Counterfeit Examples
    B-17: Big Berkey Amazon sales decrease from SSUROs
    B-18: Reputation damage example in global marketplace from wrongful EPA actions
    B-19: Berkey Statement Regarding Berkey Water Filter Lawsuit
    B-20: March 6, 2000, Pesticide Registration (PR) Notice 2000 – 1*
    B-21: Pesticide Registration Notice (PR Notice) 2023-01
    B-22: Best Water Filters for PFAS chemicals – CBS Philadelphia
    B-23: Clerk Cover Sheet
    B-24: Berkey Int'l SSURO Closed

Exhibit C: Authorities
    C-1: FIFRA, 7 U.S.C. Ch. 6 § 136
    C-2: Notice 51061 – 1976 Guidance document
    C-3: EPA Guide Standard and Protocol for Testing Microbiological Water Purifiers
    C-4: PR 2023-1, Lists of Pests of Significant Public Health Importance – Revised 2023
    C-5: Pesticide Registration Manual, Chapter 13 (updated March 1, 2023), maintained online at
        https://www.epa.gov/pesticide-registration/pesticide-registration-manual-chapter-13-devices
    C-6: Pesticide Device: A Guide to Consumers

Exhibit D: Second Declaration of James "Jim" Shepherd

Exhibit E: Declaration of James "Jim" Shepherd Regarding Trade Secrets
    (Separately filed)

CERTIFICATE OF SERVICE

I certify that on Thursday, August 24, 2023, I filed this proceeding with the Clerk of the Court through the ECF system, which will send notification of such filing to the following by email to Andrew Coghlan, Shari Howard, and Mark Walters, at the addresses shown below:

TODD KIM
Assistant Attorney General Environment & Natural Resources Division
Andrew Coghlan (CA Bar. No. 313332)
Shari Howard (IL Bar No. 6289779)
Mark Walters (TX Bar No. 00788611)
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611; Washington, D.C. 20002
Tel: (202) 598-9407
Fax: (202) 514-8865
andrew.coghlan@usdoj.gov
shari.howard@usdoj.gov
mark.walters@usdoj.gov
*Attorneys for Federal Defendants*

I will send this document to the individual defendants through their email:
Christine Tokarz, FIFRA Inspector, EPA, Region 8, tokarz.christine@epa.gov
David Cobb, Section Supervisor, Region 8, cobb.david@epa.gov
Carol Kemker, Region 4, kemker.carol@epa.gov
Keriema Newman, newman.keriema@epa.gov

*/s/Warren V. Norred*
Warren V. Norred